# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3233

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Arkansas. |
| Guy Wesley Hamilton, | * | |
| | * | [PUBLISHED] |
| Appellant. | * | |

_____

Submitted: April 17, 2009
Filed: January 13, 2010

_____

Before LOKEN, Chief Judge, HANSEN and COLLOTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

Following his conditional guilty plea to possessing child pornography, Guy Wesley Hamilton appeals from the district court's[1] denial of his motion to suppress, in which he asserted that a warrantless search of his residence violated his Fourth Amendment rights and that a subsequent warrant authorizing a second search was invalid for lack of particularity. We conclude that the original warrantless search by the parole officers was proper and that the sheriff's officers reasonably relied on the

_____

[1]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

warrant in performing the subsequent search. We therefore affirm the district court's denial of Hamilton's suppression motion.

## I.

In 1998, Guy Wesley Hamilton was convicted in the Circuit Court in Washington County, Arkansas, of first degree sexual abuse of a minor and possessing sexually explicit materials of a child, and Hamilton was separately convicted in the United States District Court for the Western District of Arkansas of transporting and possessing child pornography. He served a 51-month sentence in federal prison and was returned to state prison from where he was paroled on March 11, 2002. The conditions of Hamilton's parole required him to abstain from the use of alcohol but did not prevent him from using a computer or the internet. Hamilton was on state parole during the period of time relevant to this appeal.

On May 29, 2007, two Arkansas Adult Probation and Parole Officers, Mike Parker and James Tucker, made an unannounced visit to Hamilton's residence (a small 16 foot by 6½ foot camper trailer) at the request of Hamilton's supervising parole officer, Ashley Harvey. The visit was part of a larger spot check on area sex offenders. Around 8:00 p.m., the two parole officers knocked on the door to Hamilton's trailer and identified themselves as parole officers, to which Hamilton responded, "Let me get dressed." Approximately five minutes later, during which time the officers heard shuffling noises and a commotion inside, Hamilton answered the door wearing only sweat pants. Officer Parker advised Hamilton that they were conducting a home search, and he asked Hamilton if he had a problem with that, to which Hamilton responded, "No. Everything's fine." (Oct. 3, 2007 Mot. Hr'g Tr. at 87.) Parker stepped inside the trailer and immediately saw several empty beer cans in the trailer, a clear indication that Hamilton had violated a condition of his parole.

Officer Parker then began to search Hamilton's trailer for further violations, finding a case of beer in the refrigerator. Parker observed Hamilton's laptop computer sitting on the table, and he advised Hamilton that he was going to perform an image scan on it. When Parker opened the laptop, the screen was blank, but he noticed a media window bar with the title "Daddy and Daughter." Officer Parker could not locate the file on the laptop, which indicated to him that it was stored on an external device. Parker confronted Hamilton and advised him that he needed to cooperate, and Hamilton admitted that there were three compact disks (CDs) under a couch cushion that he had been viewing when the officers knocked. Parker put one of the CDs into Hamilton's laptop and saw that it contained a video of child pornography. Parker then contacted the Washington County Sheriff's Office for assistance.

Washington County officers arrived, arrested Hamilton, and took possession of the three CDs Hamilton had identified for the parole officers, as well as sixteen other CDs found in the vicinity of the laptop. Detective Charles Rexford of the Washington County Sheriff's Office secured the scene and, the next morning, he completed an affidavit seeking a search warrant. Detective Rexford averred that based on the parole officers' visit and the CDs they discovered, he believed that Hamilton had concealed at his residence "child p[or]nography recorded on CD's [sic], tapes, photographs, writings, along with computer, computer printer, external hard drive, cellular telephone, i-pod, and assorted computer accessories to aid in the capture and recording of said p[or]nography." (Add. at 17.) A Washington County circuit judge then issued a search warrant, which was executed that afternoon. Detective Rexford, who had prepared the warrant affidavit, led the search and seized a thumb drive, a hard drive, and the laptop computer during the warranted search.

In correcting an error on the warrant he was preparing for the circuit judge's signature, Detective Rexford unknowingly deleted the list of items to be seized from the face of the warrant. However, the items were specified in Detective Rexford's affidavit, which accompanied the warrant application at the time the circuit judge

signed and issued the warrant. Although the warrant referenced the affidavit with the words "See Attached Affidavit," the affidavit was not physically attached to the warrant when the warrant was executed on May 30, 2007, and there is no evidence in the record that the affidavit was available at the scene of the search. Detective Rexford executed the warrant and was aware of the items listed in the affidavit to be seized because he had drafted the affidavit. He subsequently discovered the clerical error in the warrant itself and filed an application for an amended search warrant on June 1, including a list of the items from the affidavit in the amended warrant. The circuit judge signed the amended warrant the same day.

Hamilton was charged with possessing a thumb drive (Count One) and a DVD (Count Two) containing visual depictions of a minor engaged in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(4)(B) & (b)(2). Following the district court's denial of Hamilton's motion to suppress the items seized from his trailer, Hamilton entered a conditional plea of guilty to count one. The thumb drive charged in count one was the one seized during the warranted search. Hamilton was sentenced to 151 months of imprisonment and a $15,000 fine. Count two was dismissed pursuant to the plea agreement. Hamilton appeals the denial of his motion to suppress.

II.

In our review of the district court's denial of Hamilton's motion to suppress evidence, we examine the district court's findings of fact for clear error, and we review *de novo* whether the searches violated the Fourth Amendment. See United States v. Walker, 555 F.3d 716, 719 (8th Cir. 2009). Hamilton challenges the warrantless search by the parole officers and the subsequent warranted search conducted by officers from the Washington County Sheriff's Office. We address each in turn.

A.    Warrantless Search by Parole Officers

Hamilton challenges the warrantless search of his home by the parole officers as violating his Fourth Amendment right to be free from unreasonable searches. See U.S. Const. amend. IV ("The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . . ").  When he was paroled, Hamilton acknowledged that as a condition of his parole, he would "submit [his] person, place of residence and motor vehicles to search and seizure at any time, day or night, with or without a Search Warrant, whenever requested to do so by any Department of Community Punishment officer."  (Oct. 3, 2007 Mot. Hr'g Tr. at 63.)  The Arkansas Post Prison Transfer Board's Policies and Procedures limit this search condition to instances where the parole officer has "reasonable suspicion that a [parolee] has committed a release violation or crime." (Add. at 23.) If Arkansas law allowed suspicionless searches as a condition of parole, then Samson v. California, which held that a suspicionless search pursuant to state law did not violate a parolee's Fourth Amendment rights, see 547 U.S. 843, 856-57 (2006), would have ended our inquiry based on Hamilton's express acknowledgment of this condition. Cf. United States v. Perkins, 548 F.3d 510, 513 (7th Cir. 2008) (noting that parolee withdrew challenge to suspicionless search of his home in light of Samson).  Because we agree with the district court that reasonable suspicion supported the parole officers' search, and because the government concedes that "'reasonable suspicion' was necessary for a lawful search" (Appellee's Br. at 16), we need not tarry on any difference between the notice of conditions provided to Hamilton and the Post Prison Transfer Board's policies.

For purposes of this appeal then, we proceed on the premise that the parole officers were entitled to search Hamilton's home without a warrant only upon a finding of reasonable suspicion of a parole violation or a crime. See United States v. Knights, 534 U.S. 112, 118-19 (2001) (holding that a warrantless search of a probationer, who had agreed to such searches as a condition of probation, was

reasonable under general Fourth Amendment analysis if supported by reasonable suspicion); Griffin v. Wisconsin, 483 U.S. 868, 873-74 (1987) (holding that a state regulation allowing warrantless searches of a probationer's home upon reasonable suspicion of a probation violation was reasonable under the special needs exception to the warrant and probable cause requirements of the Fourth Amendment). Hamilton agrees that this is the proper standard, and he challenges only the existence of reasonable suspicion to support the warrantless search, a legal issue we review *de novo*. United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007).

Reasonable suspicion exists when, considering the totality of the circumstances known to the officer at the time, the officer has a particularized and objective basis for suspecting wrongdoing. See United States v. Henry, 429 F.3d 603, 609-10 (6th Cir. 2005) (utilizing the "reasonable suspicion" test for a Terry[2] stop as articulated by the Supreme Court in United States v. Cortez, 449 U.S. 411, 417-18 (1981) in assessing whether parole officers had reasonable suspicion to meet the Griffin inquiry); United States v. Baker, 221 F.3d 438, 444 (3d Cir. 2000) (same). Because "ordinary Fourth Amendment analysis" applies to a probationary search, the parole officers' subjective purpose for the search is irrelevant to our analysis, and we look only at whether the parole officers' conclusion that reasonable suspicion existed was objectively reasonable. Knights, 534 U.S. at 122 (rejecting the Ninth Circuit's investigatory purpose analysis).

Hamilton argues that we must assess reasonable suspicion as of the time the decision to search was made–when Parole Officer Harvey initially decided to send parole officers to perform a parole search of Hamilton's home based only on the knowledge that he owned a computer and had access to the internet, which were not prohibited by his parole conditions. But the Fourth Amendment applies to the act of searching, not the initial decision to search, and it applies an objective standard based

_____

[2]Terry v. Ohio, 392 U.S. 1 (1968).

on the information known by the searching officers at the time of the search. See Terry, 392 U.S. at 21-22 ("And in making [the Fourth Amendment] assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (emphasis added)); see also United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996) ("In analyzing whether a reasonable suspicion existed, the totality of the circumstances–the whole picture–must be taken into account. We must consider the information available to the police at the time of the search." (internal citations and marks omitted)). We reject Hamilton's argument that we may look only at the facts known to Officer Harvey when she decided to send Officers Parker and Tucker to make a home visit to a parolee, and we proceed to determine whether the parole officers violated Hamilton's rights under the Fourth Amendment based on the officers' knowledge at the scene of the search.

In this case, Parole Officers Parker and Tucker knew that Hamilton had previous convictions related to child pornography received over the internet and that Hamilton had told his parole officer that he had a computer and used the internet. Armed with this information, the officers visited Hamilton's residence and knocked on the door to his trailer, identifying themselves as parole officers. At this point, Hamilton's Fourth Amendment rights had not yet been implicated, as "it does not violate the Fourth Amendment merely to knock on a door without probable cause." United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008) (quoting United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006) for the proposition that "[a]s commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."); cf. United States v. LeBlanc, 490 F.3d 361, 369 (5th Cir. 2007) ("Were we to impose a requirement that a probation officer show reasonable suspicion of criminal activity before visiting a probationer at his home, supervision would become effectively impossible."); United States v. Reyes, 283 F.3d 446, 462 (2d Cir. 2002) ("[B]ecause

a home visit is far less intrusive than a probation search, probation officers conducting a home visit are not subject to the reasonable suspicion standard applicable to probation searches under Knights." (emphasis omitted)).

There is no evidence in the record that the officers ordered Hamilton to open the door. Rather, upon hearing the parole officers' identification, Hamilton asked the officers to let him get dressed, and he then opened the door a few minutes later. While waiting for Hamilton to open the door, the parole officers heard a commotion, and, in the officers' view, it took Hamilton an inordinate amount of time to get dressed and answer the door, considering the size of the trailer and his state of dress–wearing only a pair of sweat pants–when he finally did open the door. Officer Parker informed Hamilton that they were there to do a home visit and a parole search and asked Hamilton if he had a problem with that, to which Hamilton responded, "No. Everything's fine." (Hr'g Tr. at 87.) Parker then stepped inside the trailer and immediately saw several empty beer cans strewn about, a clear indication that Hamilton had violated the condition of his parole requiring complete abstinence from alcohol.

Having lawfully entered Hamilton's trailer and observed in plain view a clear indication that Hamilton had violated his parole conditions, the circumstances known by the officers justified their continued search. The officers were suspicious that Hamilton was attempting to hide evidence of a parole violation or a crime by the inordinate amount of time it took him to answer the door, the commotion they heard while waiting, and Hamilton's state of dress when he finally opened the door. Their suspicions that Hamilton was violating the terms of his parole were confirmed by the empty beer cans. However, it was obvious to the officers that Hamilton had not been attempting to hide evidence that he had been drinking, as the beer cans were strewn about the trailer. The yet unanswered question of what Hamilton may have been trying to hide, coupled with the knowledge that Hamilton was on parole for possessing child pornography received over the internet and that he had told his parole officer

that he owned a computer and accessed the internet, justified the officers' actions in opening the lid to the laptop computer that was sitting on the table. See United States v. Winters, 491 F.3d 918, 922 (8th Cir. 2007) (considering the totality of the circumstances, including knowledge that the defendant was a prior drug offender, in assessing officers' reasonable suspicion to search defendant's car); United States v. Hoosman, 62 F.3d 1080, 1081 (8th Cir. 1995) (holding that officer had reasonable suspicion to search defendant's automobile based on his belief that defendant was attempting to hide a weapon or contraband, considering the officer's knowledge that defendant had a history of trafficking drugs and officer's observations of defendant moving from side to side in the car when the officer activated his flashing lights); cf. Wilson v. Arkansas, 752 S.W.2d 46, 47-48 (Ark. Ct. App. 1988) (holding that appellant, who was subject to identical supervision condition at issue here, was not denied Fourth Amendment protections because his "refusal [to allow officers to search his residence] gave the officers 'reasonable cause to believe that the appellant had failed to comply with a condition of his probation,'" justifying entry of residence where they saw marijuana in plain view). Once the laptop computer was open, the media title "Daddy and Daughter" provided ample reasonable suspicion to search further for child pornography. The district court properly denied Hamilton's motion to suppress the evidence seized during the parole officers' search.

B.      Warranted Search by the Washington County Sheriff's Office

Hamilton next challenges the denial of his motion to suppress the evidence seized the following day pursuant to the search warrant because the list of items to be seized was not included in the warrant as mandated by the Fourth Amendment's Warrant Clause. See U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). It is undisputed that the affidavit accompanying the warrant application contained a sufficiently limiting list of items to be seized, but those items were inadvertently not listed in the warrant itself.

The Government argues that the reference in the warrant stating "See Attached Affidavit" satisfies the Fourth Amendment's particularity requirement. The Government also asserts that there was no risk that the wrong items would be seized because Detective Rexford, who prepared both the affidavit and the warrant, was the officer who executed the warrant, and that the items seized were, in fact, all within the list of items included in the affidavit.

The Warrant Clause's particularity requirement can be satisfied by including the items to be seized in an affidavit or attachment that is adequately referenced in the search warrant. See United States v. Gamboa, 439 F.3d 796, 807 (8th Cir. 2006) ("'[A]n affidavit may provide the necessary particularity for a warrant if it is either incorporated into or attached to the warrant.'" (quoting Rickert v. Sweeney, 813 F.2d 907, 909 (8th Cir. 1987))). In acknowledging that courts of appeals have allowed a search warrant to be read in conjunction with other documents, see Groh v. Ramirez, 540 U.S. 551, 557 (2004) ("We do not say that the Fourth Amendment prohibits a warrant from cross-referencing other documents."), the Supreme Court gleaned from the appellate decisions it cited the following conditions under which a warrant will be read to incorporate another document: "if the warrant uses appropriate words of incorporation, *and* if the supporting document accompanies the warrant," id. at 557-58 (emphasis added). In Groh, both limitations were lacking; the warrant did not incorporate the other documents and the other documents did not accompany the warrant, leaving the Court no reason to "further explore the matter of incorporation." Id. at 558.

The fighting question in the case before us is whether the incorporated document must accompany the warrant to the search in order to satisfy the Fourth Amendment's particularity requirement. In defining the circumstances under which the courts of appeals had allowed supporting documents to meet the particularity requirement in Groh, the Supreme Court cited to our case of United States v. Curry, 911 F.2d 72, 76-77 (8th Cir. 1990). See Groh, 540 U.S. at 558. In Curry, we noted

that "a description in a supporting affidavit can supply the requisite particularity if 'a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein.'" Curry, 911 F.2d at 77 (quoting United States v. Strand, 761 F.2d 449, 453 (8th Cir. 1985), in turn quoting United States v. Johnson, 541 F.2d 1311, 1315 (8th Cir. 1976)). Recognizing the less exacting fashion in which some courts had applied the two criteria, we reiterated our "circuit's well-established rule that the affidavit must both accompany the warrant and be incorporated into it." Id. at 77 n.4 (restricting Rickert's "or" language, which was taken from an Eleventh Circuit case, and noting that Rickert "should not be construed as having modified this circuit's well-established rule"). Nonetheless, some of our cases have listed the requirements for properly referencing another document as an either/or proposition. See, e.g., United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008) ("An affidavit may provide the necessary particularity for a warrant if it is incorporated into the warrant, attached to the warrant, or present at the search."); Gamboa, 439 F.3d at 807.

Since Groh's endorsement of allowing an incorporated document to satisfy the particularity requirement, courts have focused more directly on the issue of whether, for purposes of the particularity requirement, the incorporated document must also accompany the warrant to the search for the warrant to satisfy the Warrant Clause of the Fourth Amendment. In Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms, 452 F.3d 433, 440 (6th Cir. 2006) (en banc), the Sixth Circuit addressed the issue in a Bivens[3] case where a warrant clearly incorporated an affidavit that provided the list of specific items to be seized, but the incorporated document was sealed and not available at the search. The en banc court explained that the particularity requirement is part of the Warrant Clause of the Fourth Amendment, which provides the requirements for properly issuing a warrant. Id. at 440-41 (noting that the Warrant Clause of the Fourth Amendment explicitly applies

---

[3]See Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).

to "issuance" of the warrant–"'no Warrant shall issue,' it says" (quoting U.S. Const. amend. IV)). Whether a warrant is properly issued, however, is a separate question from whether it is reasonably executed, which is governed by the Reasonableness Clause of the Fourth Amendment, see id. at 444-45 ("To say that a warrant satisfies the Warrant Clause upon issuance, however, by no means establishes that a search satisfies the Reasonableness Clause upon execution."), and the Sixth Circuit held that the failure to bring the incorporated document to the search did not make the search a warrantless one, id. at 444 ("The salient point is that Groh did not establish a one-size-fits-all requirement that affidavits must accompany all searches to prevent a lawfully authorized search from becoming a warrantless one."); see also United States v. Hurwitz, 459 F.3d 463, 472-73 (4th Cir. 2006) ("We see nothing in the Constitution requiring that an officer possess or exhibit, at the time of the search, documents incorporated into a warrant as an additional safeguard for the particularity requirement."); United States v. Basham, 268 F.3d 1199, 1204 (10th Cir. 2001) (noting that the reasonableness of the execution of a warrant "is an entirely different matter than the question of whether the warrant itself is valid").

We recently, but indirectly, addressed this issue in the habeas action brought by the same claimant involved in the Sixth Circuit's Baranski case. See Baranski v. United States, 515 F.3d 857, 860-61 (8th Cir. 2008). We had previously denied Baranski's direct criminal appeal, including his claim that the police officers who executed the search warrant violated his Fourth Amendment rights. See United States v. Baranski, 75 F. Appx. 566 (8th Cir. 2003) (unpublished per curiam) (concluding that even if the officers violated the Fourth Amendment, they acted in good faith reliance on the warrant), cert. denied, 541 U.S. 1011 (2004). Baranski later filed a 28 U.S.C. § 2255 petition for postconviction relief, asserting that the Supreme Court's intervening Groh case and his success in the Bivens action in the Sixth Circuit (a panel decision later reversed by the Sixth Circuit en banc) entitled him to habeas relief. We denied Baranski's habeas claim, partly because the Sixth Circuit en banc had reversed the panel opinion that had originally granted relief to Baranski in his Bivens action,

and partly because <u>Groh</u> did not represent the type of intervening change in authority that would negate our prior holding on direct appeal, which was the law of the case. <u>See</u> <u>Baranski</u>, 515 F.3d at 861. In doing so, we noted that the reference in the warrant to a sealed affidavit in <u>Baranski</u> was analogous to the warrant's incorporation of a separate document in <u>Gamboa</u>. We distinguished <u>Groh</u> because the magistrate in <u>Baranski</u> had signed the affidavit containing the limiting list of items to be seized, which satisfied the concern expressed in <u>Groh</u> that it be clear that the magistrate had the opportunity to restrict the scope of the search. <u>Id.</u> at 860. "Because the warrant in Baranski's case satisfied the particularity requirement when issued and because officers performed the search reasonably, no constitutional violation occurred." <u>Id.</u> at 861 (citing <u>Baranski</u>, 452 F.3d at 436).

Although the warrant in this case incorporated the affidavit with a "See Attached Affidavit" (Add. at 15), when read in context it is not clear that it did so in reference to the items to be seized. The warrant states, "there is now being concealed certain property, namely    which is in violation of Arkansas State statute . . . ." (<u>Id.</u>) The space between "namely" and "which," as well as the nonsensical reading of the sentence, makes clear that the warrant preparer intended to insert specific items between the two words but failed to do so. The reference to the attached affidavit comes later in the warrant when the issuing judge certifies:

> [A]nd further I find that on the basis of the preceding before me there is reasonable cause to believe that the search will discover the items specified in this warrant, and that the items specified are subject to seizure and as I am satisfied in this warrant and that there is probable cause to believe that the property so described is being concealed on the object(s) above described, and that the foregoing grounds for application of the search warrant exist: See Attached Affidavit.

(<u>Id.</u>) The language of incorporation is not as clear as that contained in <u>Baranski</u>, 452 F.3d at 436 (where the warrant said "See Attached Affidavit" in the location on the

-13-

warrant describing the things to be seized), or as defective as the warrants in Groh, 540 U.S. at 558 (where the warrant erroneously described the things to be seized as a blue house, which actually described the place to be searched, and it failed to incorporate at all the affidavit listing the items) or Curry, 911 F.2d at 77 (where the warrant stated only that "the application and supporting affidavit . . . (were) duly presented and read by the Court" but did not incorporate the application or the affidavit). Thus, the question remains whether the reference to the "Attached Affidavit" in this warrant satisfies the need for a "sufficiently incorporated" document. Gamboa, 439 F.3d at 807 (distinguishing Groh on the basis that the affidavit in Gamboa was sufficiently incorporated, whereas it was not in Groh); see also Groh, 540 U.S. at 557-58 (noting that courts of appeals required that "the warrant use[] appropriate words of incorporation").

If the warrant in this case referred to the attached affidavit for the explicit purpose of delineating the items to be seized, and if we were writing on a clean slate, we would be inclined to follow the reasoning of the Sixth Circuit in Baranski and conclude that an affidavit incorporated into a warrant need not accompany the warrant to the search for purposes of meeting the particularity requirement of the Warrant Clause. See Baranski, 452 F.3d at 442 ("In the aftermath of the Court's most recent decision in this area, United States v. Grubbs, 547 U.S. 90 (2006), the possibility that the Warrant Clause requires officers to produce a copy of the warrant (and any affidavit) at the outset of the search seems even less plausible."). But given the questionable state of the law in our circuit about whether an incorporated affidavit must accompany a search warrant to the search for purposes of the particularity requirement, compare Baranski, 515 F.3d at 860 (concluding that reference to a sealed affidavit satisfied the particularity requirement) with Curry, 911 F.2d at 77 n.4 (reiterating our circuit's "well-established rule" that an incorporated affidavit must also accompany the warrant), and given the ambiguity on the face of the warrant as to whether the reference to the attached affidavit was intended to refer to the items to be seized or merely the existence of probable cause, there are enough thorny issues in this

-14-

case to convince us to avoid deciding this issue. We are able to do so because, even if the warrant failed to meet the particularity requirement of the Warrant Clause, the facts of this case do not support imposition of the exclusionary rule.

Not every Fourth Amendment violation results in exclusion of the evidence obtained pursuant to a defective search warrant. See Herring v. United States, 129 S. Ct. 695, 700 (2009). "[T]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands." Arizona v. Evans, 514 U.S. 1, 10 (1995). Rather, exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Herring, 129 S. Ct. at 699 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). "Indeed, exclusion has always been our last resort, not our first impulse, and [Supreme Court] precedents establish important principles that constrain application of the exclusionary rule." Id. at 700 (internal citations and quotation marks omitted).

As a judicially-created remedy, the exclusionary rule applies only where "its remedial objectives are thought most efficaciously served." Evans, 514 U.S. at 11. The exclusionary rule is not an individual right, but it "applies only where it 'results in *appreciable deterrence*.'" Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)) (emphasis added) (some internal marks omitted); see also Penn. Bd. of Probation & Parole v. Scott, 524 U.S. 357, 368 (1998) ("We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence."). The Court also balances the benefits of deterrence against the costs of excluding the evidence, particularly the social costs of "letting guilty and possibly dangerous defendants go free–something that 'offends basic concepts of the criminal justice system.'" Herring, 129 S. Ct. at 701 (quoting Leon, 468 U.S. at 908). Finally, the Supreme Court includes "an assessment of the flagrancy of the police misconduct" in its calculus of whether the exclusionary rule should be applied. Id. (internal marks omitted).

Hamilton argues that Groh requires exclusion of the evidence based on its discussion of Leon. In Leon, the Court held that evidence obtained pursuant to a defective warrant should not be suppressed if the officer who seized the evidence did so in good faith reliance on the warrant issued by a neutral judge. 468 U.S. at 922. The Court noted four instances in which an officer's reliance would not be objectively reasonable, one of which is when a warrant is so facially deficient that no officer could reasonably believe it to be valid. Id. at 923. Groh noted that the warrant in that case was "so obviously deficient" that the search must be regarded as warrantless, citing Leon. Groh, 540 U.S. at 558. The Court concluded that the police officers in that case were not entitled to qualified immunity because "no reasonable officer could believe that a warrant that plainly did not comply with th[e Fourth Amendment particularity] requirement was valid." Groh, 540 U.S. at 563. The Court also noted that the officer could not have "reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized" because the same officer prepared the invalid warrant and included a description of the house to be searched in the place intended to list the items to be seized. Id. at 564.

We reject Hamilton's reliance on Groh. The warrant in this case included a clear incorporation of the affidavit, which itself included an explicit list of items to be seized. The issuing judge signed both the warrant and the affidavit, demonstrating both that the circuit judge approved the search with reference to the affidavit and that the judge had the opportunity to limit the scope of the search. See Baranski, 515 F.3d at 860 (distinguishing Groh on the basis that it was unascertainable whether the magistrate was aware of the scope of the authorized search). In contrast, the warrant in Groh failed to make any reference to the affidavit at all, which led the Court to look only to the face of the warrant. The problem with the warrant here is not a wholesale failure to incorporate the affidavit, but whether the warrant used "appropriate words of incorporation" sufficient to incorporate the list of items to be seized. Groh, 540 U.S. at 557-58. Given our caselaw approving the use of incorporated documents to

satisfy the particularity requirement, it was objectively reasonable for an officer with Detective Rexford's knowledge and involvement in the warrant application process to rely on the warrant as incorporating the list of items to be seized from the affidavit, even if we were now to conclude that the words of incorporation were less than clear. While there is some ambiguity about whether the phrase "See Attached Affidavit" was intended to refer to the list of items to be seized, the phrase is sufficient to distinguish this case from Groh, which clearly made no reference to another document. Although "the warrant was not a model of clarity, we nonetheless cannot say that [the] warrant was so facially deficient that the executing officers could not reasonably have presumed it to authorize" seizure of the items included in the attached affidavit. United States v. Watson, 498 F.3d 429, 433 (6th Cir. 2007) (internal marks and citations omitted) (distinguishing Groh as involving a far more conspicuous error).

Our conclusion that the exclusionary rule should not be applied in this case is buttressed by the Supreme Court's most recent discussion of the exclusionary rule in Herring, where exclusion of evidence from a criminal trial was directly at issue. In Herring, the Court noted that "the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional." 129 S. Ct. at 702. The Court described cases in which exclusion was the proper remedy, including Weeks v. United States, 232 U.S. 383, 393-94 (1914), which involved police officers who broke into the defendant's home, took incriminating papers, and later returned with a U.S. Marshal to confiscate more, all without a search warrant or the information required to obtain one. Herring, 129 S. Ct. at 702. It also described Silverthorne Lumber Co. v. United States, 251 U.S. 385, 390 (1920), where officers "'made a clean sweep' of every paper they could find" "'without a shadow of authority,'" and Mapp v. Ohio, 367 U.S. 643, 644-45 (1961), where officers forced open the defendant's door, refused to allow her attorney to enter, and brandished a false warrant as authority for their search for obscenity. Herring, 129 S. Ct. at 702. The Court distinguished these cases from the type of error involved in Herring, which it characterized as "[a]n error that arises from nonrecurring and attenuated

negligence," concluding that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Id.

Detective Rexford's conduct cannot be construed as more than nonrecurring negligence. He prepared both the affidavit and the warrant, initially including the list of items in both but inadvertently deleting the list from the face of the warrant in correcting another clerical error. The warrant clearly incorporated the affidavit. The circuit judge signed both the warrant and the affidavit. And Detective Rexford, with full knowledge of the items authorized to be seized, carefully executed the warrant, seizing only those items included in the list of items in the affidavit. This is not the type of case for which the deterrent effect of excluding evidence outweighs the social costs of "letting guilty and possibly dangerous defendants go free–something that 'offends basic concepts of the criminal justice system.'" Herring, 129 S. Ct. at 701 (quoting Leon, 468 U.S. at 908); see also Watson, 498 F.3d at 434 (holding that suppression of evidence would not deter police conduct "that can be characterized as a minor, unintentional drafting oversight," unnoticed by either the drafting officer or the issuing judicial commissioner).

Even if the warrant in this case failed to meet the particularity requirement of the Fourth Amendment's Warrant Clause, Detective Rexford's actions were objectively reasonable in believing that the warrant and its reference to the affidavit authorized the seizure of the items removed from Hamilton's residence on May 30, 2007. We therefore affirm the district court's denial of Hamilton's motion to suppress the evidence seized pursuant to the warrant.

III.

The judgment of the district court is affirmed.

_____

-18-