# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2142

_____

United States of America

*Plaintiff - Appellee*

v.

Thomas Thadeus Szczerba, also known as Enzo

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 14, 2018
Filed: July 26, 2018

_____

Before WOLLMAN, SHEPHERD, and ERICKSON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A jury found Thomas Thadeus Szczerba guilty of the following four offenses related to interstate prostitution: one count of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371; one count of interstate transportation of an individual to engage in prostitution in violation of 18 U.S.C. §§ 2421 and 2; one count of use of facilities in interstate commerce with intent to aid

an enterprise involving prostitution in violation of 18 U.S.C. §§ 1952(a)(3) and 2; and one count of use of facilities in interstate commerce with intent to distribute proceeds from an enterprise involving prostitution in violation of 18 U.S.C. §§ 1952(a)(1) and 2. The district court[1] sentenced Szczerba to 140 months' imprisonment. Szczerba appeals from the denial of his motion to suppress evidence, his motion to exclude expert evidence, his motion for a mistrial, his motion for a new trial based on the government's failure to disclose certain evidence, and his motion for judgment of acquittal. Szczerba also argues that the district court erred in calculating his sentence and imposed a substantively unreasonable sentence. We affirm.

## I. Background

B.M. moved from Louisiana to Houston, Texas, for a fresh start. She met Szczerba in 2015, while she was working as a stripper at a club that he frequented. Szczerba befriended B.M. and introduced her to Keisha Edwards, a prostitute who used the alias Stacey Monroe. B.M. eventually moved into the apartment that Szczerba and Edwards shared. In June 2015, B.M. began performing sex acts for money, using the alias Avery Monroe. At that time, she was twenty-two years old.

Szczerba and Edwards took photos of B.M. and posted them with an advertisement on Backpage.com, a website known for advertising prostitutes. Szczerba gave B.M. a phone and a script to use when customers called. She recorded in a notebook the customer's first name, the length of time the customer had requested, and the amount that the customer had agreed to pay. Szczerba and Edwards set the rates for B.M.'s services, requiring her to make $1,000 per day. B.M. met customers at Szczerba's Houston apartment and at other locations. After having sex with the men, she gave Szczerba the money she received.

---

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

Szczerba provided B.M. with condoms, food, clothing, and personal hygiene products. He controlled when she slept and when she ate. He regulated her phone access. He carried in his wallet a card on which were written B.M.'s full name, her social security number, and her family's address. B.M. testified that she felt threatened by Szczerba, and she worried that he would find her family. Szczerba publicly embarrassed and degraded B.M. by loudly calling her a bitch, a whore, and a slut.

Szczerba's social media account described him as "the king, professional relationship consultant, thoroughbred, the horse trainer," and he included hashtags like #PGO and #AOB, which mean Pimping Going On and All On a Bitch. Law enforcement officers testified that the term "king" means pimp, that "stable" refers to the pimp's prostitutes, and that "thoroughbred trainer" means a pimp with "the most thoroughly trained girl; the top-of-the-line girl."

In late June 2015, Szczerba drove B.M. from Houston to Chicago, Illinois, where they met Edwards. Several days later the three traveled to Wisconsin. On July 10, 2015, they traveled to St. Louis, where Edwards rented a room at a downtown hotel. Edwards and B.M. saw customers in each city, after Szczerba and Edwards placed advertisements for the services of Stacy and Avery Monroe on Backpage.com.

B.M. started her menstrual cycle during the stay in St. Louis. Szczerba told her to place a make-up sponge in her vagina so that customers would not know that she was menstruating. The sponge did not work, however, and B.M. bled on a customer during vaginal intercourse. B.M. worried that Szczerba would be angry if the customer did not pay, so she stopped intercourse and called Szczerba, who instructed her to place another sponge in her vagina, which she did. B.M. finished having intercourse with the customer, later describing it as "excruciating" and "like contractions."

-3-

One of the make-up sponges was lodged in B.M.'s vagina. She asked Szczerba to take her to the hospital, but he decided to remove the sponge himself with tweezers. Szczerba eventually drove B.M. to the hospital to have the sponge removed. As he dropped her off, Szczerba told B.M. to use her alias and "Don't be stupid." A physician assistant removed the sponge and prescribed antibiotics for B.M., who used the first name Avery and her real last name. Although Szczerba wanted B.M. to continue working that night, she was in too much pain to see customers. She resumed working the next day.

B.M. had not been meeting her $1,000 daily quota in St. Louis, so Szczerba instructed her to go out and find customers. B.M. and Edwards went to a few bars in downtown St. Louis on July 15, 2015, and eventually met a man named Jordan. The three went back to Jordan's apartment, where they had drinks and used cocaine. An argument erupted when Edwards tried to steal Jordan's phone, causing Edwards to run out of the apartment. When Jordan and B.M. went down to the lobby of the apartment building, they discovered Edwards and Szczerba. According to B.M., "[e]veryone was screaming" and Jordan "was mad about the phone and was waving a gun at Szczerba."

B.M. decided to flee. She lost a shoe as she ran and kicked off the other one. B.M. testified that she "ran until [she] found somewhere safe to hide." She climbed inside a dumpster, where she stayed until she no longer could hear Szczerba and Edwards calling for her. B.M. then climbed out of the dumpster, hid behind it, and called a friend in Houston, who used three-way calling to dial 911 at approximately 5:27 a.m. on July 16, 2015. When officers arrived, B.M. was standing shoeless and scared near a dumpster. Officers brought her to the hospital for medical care.

Sergeant Patricia Nijkamp of the St. Louis Metropolitan Police Department met B.M. at the hospital. Nijkamp was an intelligence detective at the time and was

responsible for investigating crimes related to human trafficking, sex trafficking, and labor trafficking.

B.M. appeared shaken as she told Nijkamp about how Szczerba kept her from using her cell phone, from eating, and from sleeping, until she made $1,000, and how he forced her to work while she was menstruating. B.M. gave Nijkamp a black notebook, which included the script for taking calls and listed the first names of various men, dates, times, addresses, lengths of time, and amounts to be charged.

B.M. told Nijkamp the room number and hotel name where Szczerba and Edwards were staying and said that Szczerba had driven from Texas to Missouri in a gold Mercedes. Nijkamp confirmed that there was a room registered to Edwards at the hotel and that there was a gold Mercedes registered to Edwards in the hotel parking lot. Nijkamp thereafter went to the hotel room, where Szczerba and Edwards were arrested and refused consent to a search. After Nijkamp and other law enforcement officers secured the hotel room and the Mercedes, Nijkamp applied for a search warrant.

After the warrant issued, officers searched the hotel room and the Mercedes. Among the items they found were several boxes of condoms, sex toys, dental dams, make-up sponges, feminine hygiene products, medication prescribed to Avery M., and several receipts. Szczerba and Edwards were charged in a seven-count superseding indictment with offenses related to sex trafficking and prostitution. After the district court denied the motions to suppress evidence and to exclude expert evidence, the case proceeded to trial. On the first day of trial, Edwards pleaded guilty to use of facilities in interstate commerce with intent to aid an enterprise involving prostitution and use of facilities in interstate commerce with intent to distribute proceeds from an enterprise involving prostitution.

The government called as witnesses B.M., Nijkamp, and several other law enforcement officers. It presented the evidence discovered in the hotel room and in the Mercedes, as well as the recording of B.M.'s 911 call, the Backpage.com advertisements for Stacy and Avery Monroe, and evidence of Szczerba's bank transactions and his posts on social media. Over Szczerba's objection, the district court allowed Detective Derek Stigerts of the Sacramento, California, Police Department to testify as an expert. Stigerts defined terms that are commonly used in the "pimp/prostitution subculture." He also explained how prostitutes are advertised and how pimps recruit and control prostitutes.

Before the fourth day of trial began, the prosecutor produced a summary of an interview prepared by Special Agent Jennifer Lynch of the Federal Bureau of Investigation (FBI). The summary previously had not been disclosed to defense counsel. According to the document, Lynch and Nijkamp interviewed a man who had met B.M. in St. Louis on July 15, 2015. After he bought B.M. and Edwards drinks, B.M. told the man she had been a stripper and showed him photos of her wearing lingerie. At approximately 12:30 or 1:00 a.m., the man declined to pay the women for sex. Defense counsel cross-examined Lynch about the contents of the summary and argued in closing that the incident tended to show that B.M.—not Szczerba or Edwards—advertised herself as a prostitute.

On the fifth day of trial, after the case was submitted to the jury and the alternate juror was released, one of the jurors called in to report that he would not be able to continue serving as a juror. Before the court declared a mistrial and while it was explaining to the jury what had happened, the twelfth juror called and said that he could report for duty. The court overruled Szczerba's objection to allowing the jury to continue deliberating and denied his motion for a mistrial.

The twelve-member jury returned guilty verdicts on four of the seven counts charged against Szczerba. The district court denied Szczerba's post-trial motion for judgment of acquittal or a new trial.

## II. Discussion

### A. Motion to Suppress Evidence

Sergeant Nijkamp requested that a search be authorized for the hotel room and the Mercedes. Her affidavit in support of the search warrant stated that on July 16, 2015, B.M. had "escaped from two suspects that had been forcing her to prostitute herself." It explained that B.M., Szczerba, and Edwards had been staying in St. Louis for approximately five days, during which:

> Szczerba[] put the victim in a constant state of fear for her safety by threatening to beat her, forcefully grabbing her face while yelling and berating her, denying her freedom of movement, having control of her cell phone, denying her requests for food . . . . [and] not allowing her to rest or sleep until she reached her daily quota of $1000 . . . , and forcing her to prostitute herself while on her menstrual cycle by using a make up sponge as a feminine hygiene product.

The affidavit identified the hotel name, address, and room number, as well as the Mercedes's Texas license plate number and vehicle identification number. The affidavit listed the following evidence that B.M. stated would be found in the room and the vehicle: cell phones, laptop computers, large amounts of cash, condoms, lubricant, and receipts and paperwork relating to the crime of trafficking for the purpose of sexual exploitation. Nijkamp presented the affidavit to a state court judge, before whom the affidavit was "[s]ubscribed and sworn to." The state court judge also signed the affidavit.

On the basis of the criminal complaint and Nijkamp's affidavit, a state court judge found that there was probable cause for the issuance of a search warrant. The warrant stated that the hotel room and the gold Mercedes were registered to Edwards. It identified the name, address, and room number of the hotel and the location, license plate number, and vehicle identification number of the Mercedes. Instead of commanding the search of the hotel room or the Mercedes, however, the warrant stated that it authorized the search of "said person." The warrant did not identify the items authorized to be seized during the search, and although it referred to Nijkamp's supporting affidavit, it did not incorporate the affidavit by reference.

Nijkamp served as the lead detective in the case. She believed that the warrant authorized the search of the hotel room and of the Mercedes and the seizure of evidence set forth in her affidavit. Nijkamp brought a copy of the warrant and the supporting affidavit with her when she went to conduct the searches. She, along with her lieutenant, supervised the officers searching the hotel room and the vehicle. As set forth above, the officers found incriminating evidence during the searches.

Szczerba moved to suppress evidence. A magistrate judge[2] determined that the warrant was invalid because it did not accurately describe the locations to be searched and did not particularly describe the items to be seized. The magistrate judge concluded, however, that the officers' reliance on the warrant was objectively reasonable and thus recommended that the motion to suppress be denied. Over Szczerba's objection, the district court adopted the recommendation and denied the motion. In reviewing the denial of a motion to suppress evidence, we review for clear error the district court's findings and *de novo* its conclusions of law. United States v. Hamilton, 591 F.3d 1017, 1021 (8th Cir. 2010).

---

[2]The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri.

Szczerba argues that the district court properly determined that the search warrant was invalid, but erred in applying the Leon good-faith exception to the exclusionary rule. He contends that the warrant did not authorize the search of the hotel room or the car, nor did it set forth any items to be seized. We view the warrant as having two problems: the authorization of the search of "said person" and the failure to list the items to be seized.

We first conclude that the warrant's authorization to search "said person" instead of "said property" did not render the warrant invalid. The warrant particularly described the hotel room and the Mercedes. The omission of the word "property" from the authorizing language appears to be a clerical error in light of the warrant's meticulous identification of the hotel room and the Mercedes, the affidavit's similarly meticulous description and its request to search the hotel room and the Mercedes, and the warrant's otherwise nonsensical authorization of the seizure of "above described property" (*i.e.*, the hotel room and the Mercedes) if it "be found on the said person by you."[3] In these circumstances, a reasonable officer executing the warrant likely would have read the warrant to authorize the search of the particularly described property and not the person who was mentioned only in relation to the property and only because the property was registered in her name.

The warrant lacked particularity, because it did not list the items to be seized or incorporate Nijkamp's affidavit. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement can be satisfied by listing the items to be seized in the warrant itself or in an affidavit that is incorporated into the warrant. Hamilton, 591 F.3d at 1024. The Supreme Court has said that a

_____

[3]Nijkamp testified that she borrowed the authorizing language from other search warrants and erroneously used the word "person" instead of "property."

warrant will be read to incorporate an affidavit "if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." Groh v. Ramirez, 540 U.S. 551, 557-58 (2004); see United States v. Curry, 911 F.2d 72, 77 (8th Cir. 1990) ("[A] description in the supporting affidavit can supply the requisite particularity if 'a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein.'" (quoting United States v. Strand, 761 F.2d 449, 453 (8th Cir. 1985))).

We do not agree with the government's contention that the details-lacking warrant incorporated Nijkamp's affidavit by reference. The warrant mentioned the affidavit only once in its averment of probable cause. Both the Supreme Court and this court have concluded that a warrant does not incorporate a supporting affidavit when it merely states that the affidavit establishes probable cause. See Groh, 540 U.S. at 555, 558 (holding that a warrant did not incorporate the supporting affidavit by "recit[ing] that the Magistrate was satisfied the affidavit established probable cause to believe that contraband was concealed on the premises"); Strand, 761 F.2d at 453 (holding that a warrant did not incorporate the supporting affidavit by stating that the "grounds for application for issuance of the search warrant exist as stated in the supporting affidavit(s)"); see also Curry, 911 F.2d at 77 (holding that a warrant did not incorporate the supporting affidavit because it "did not contain suitable words of reference . . . , such as 'see attached affidavit' or 'as described in the affidavit'" (citations omitted)).

"Not every Fourth Amendment violation results in exclusion of the evidence obtained pursuant to a defective search warrant," however. Hamilton, 591 F.3d at 1027. Because the purpose of the exclusionary rule is to "safeguard Fourth Amendment rights generally through its deterrent effect," Herring v. United States, 555 U.S. 135, 139-40 (2009) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)), it "applies only where it 'result[s] in appreciable deterrence,'" id. at 141 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). Exclusion "almost always

-10-

requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," Davis v. United States, 564 U.S. 229, 237 (2011), and can result in "letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system,'" Herring, 555 U.S. at 141 (quoting Leon, 468 U.S. at 908). "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Davis, 564 U.S. at 237.

Over time, the Supreme Court has "recalibrated [its] cost-benefit analysis in exclusion cases to focus on the 'flagrancy of the police misconduct' at issue.'" Id. at 238 (quoting Leon, 468 U.S. at 911). When law enforcement officers "exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Id. at 238 (quoting Herring, 555 U.S. at 144). But "when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" Herring, 555 U.S. at 147-48 (quoting Leon, 468 U.S. at 907-08 n.6).

Szczerba argues that the evidence should have been suppressed because the warrant was "so facially deficient that no executing officer could reasonably presume its validity." Appellant's Br. 15. He cites the Supreme Court's decision in Groh v. Ramirez, which held that the Leon good-faith exception to the exclusionary rule did not entitle officers to qualified immunity after they conducted a search based on a warrant that failed to identify the items that officers intended to seize and did not incorporate by reference the itemized list that was contained in the warrant application. Neither the warrant application nor the affidavit accompanied the warrant when officers executed the search, as both documents had been placed under seal. The Court held that no reasonable officer could believe that the warrant was valid, explaining that "even a cursory reading of the warrant in this case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." Groh, 540 U.S. at 564.

Similarly, in <u>Leon</u>, the Court explained that suppression remains an appropriate remedy if, "depending on the circumstances of the particular case, a warrant [is] so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." <u>Leon</u>, 468 U.S. at 923.

Considering the circumstances surrounding the issuance and execution of the search warrant in this case, we conclude that the warrant was not so obviously deficient that any reasonable officer would have known that it was constitutionally fatal. With respect to the places to be searched, the district court found that the warrant "clearly and immediately present[ed] to the reader's eye the two locations that Sgt. Nijkamp knew were the subjects of her affidavit and were the expected locations for authorized searches." Order and Recommendation of June 7, 2016, at 12. Although the warrant itself did not describe the items to be seized, it specifically referred to Nijkamp's affidavit ("the supporting written affidavit"), which "clearly describes the locations to be searched (the hotel room and the vehicle) and the items to be seized (cell phones, lap top computers, large amounts of cash, condoms, lubricants, and the receipts and paperwork relating to the alleged crime)." <u>Id.</u> The issuing judge signed the supporting affidavit, and Nijkamp testified that she brought both the affidavit and the warrant with her to supervise the search of the hotel room and the Mercedes. That the affidavit was signed by the issuing judge and that it accompanied the warrant distinguishes this case from <u>Groh</u>.

Moreover, application of the exclusionary rule in this case would not result in appreciable deterrence of police misconduct. To be sure, Nijkamp acted negligently in drafting the warrant. She should have used appropriate authorizing language and ensured that the supporting affidavit was incorporated into the warrant. But in considering the totality of the circumstances, the district court found that Nijkamp was "most mindful of the Fourth Amendment warrant requirement," in that she asked for consent to search, secured the hotel room after consent was refused, applied for

a warrant, and "concealed no facts from the judge." Order and Recommendation of June 7, 2016, at 12. Nijkamp's conduct certainly did not reflect the type of deliberate, reckless, or grossly negligent disregard for the Fourth Amendment that the exclusionary rule can effectively deter. We thus conclude that the district court did not err in denying Szczerba's motion to exclude evidence.

## B. Motion To Exclude Expert Testimony

Months before trial began, the government filed its summary of expected expert testimony, identifying as an expert Derek Stigerts, a detective with the Sacramento, California, Police Department and a member of an FBI task force that specializes in sex-trafficking investigations. The district court denied Szczerba's motion *in limine* to exclude Stigerts's expert testimony and overruled Szczerba's objection to the testimony at trial. We review the district court's decision to admit expert testimony for abuse of discretion. United States v. Kenyon, 481 F.3d 1054, 1061 (8th Cir. 2007).

Szczerba claims that Stigerts's testimony was admitted in violation of the disclosure requirements of Federal Rule of Criminal Procedure 16(a)(1)(G), which states that "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rule[] 702 . . . of the Federal Rules of Evidence during its case-in-chief at trial." The summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). We conclude that the government satisfied the Rule's requirements. The summary of expert testimony indicated that Stigerts would explain how pimps recruit, control, coerce, and advertise prostitutes and that he would testify regarding the business and subculture of sex-trafficking, including the language and practices commonly used. Stigerts's *curriculum vitae* set forth his twenty-five years of experience as a law enforcement officer, which included extensive experience in investigating crimes

related to prostitution and in interviewing pimps and women involved in prostitution. Stigerts's trial testimony hewed closely to the topics set forth in the summary, and defense counsel most ably cross-examined him. The district court thus did not abuse its discretion in admitting the testimony.

Szczerba next argues that Stigerts's testimony violated Federal Rule of Evidence 702 because it was not based on reliable principles and methods. He contends that Stigerts "should not have been permitted to opine as to his understanding of terminology and as to what pimps and prostitutes 'typically' do because his opinions were not the product of reliable principles and methods." Appellant's Br. 37. We disagree. Stigerts possessed adequate credentials and sufficient factual data—including his interviews of more than 300 women involved in prostitution and 30 suspected pimps, as well as his investigation of more than 120 sex-trafficking cases— on which to base his testimony. See United States v. Geddes, 844 F.3d 983, 991 (8th Cir. 2017) (holding that "the district court did not abuse its discretion in allowing expert testimony 'regarding the operation of a prostitution ring, including recruitment of prostitutes and the relationship between pimps and prostitutes, and regarding jargon used in such rings.'" (quoting United States v. Evans, 272 F.3d 1069, 1094 (8th Cir. 2001))); see also United States v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014) (holding that "the district court did not abuse its discretion by allowing Detective Stigerts to testify as an expert regarding the prostitution trade").

We also reject Szczerba's argument that his Sixth Amendment right to confront witnesses was violated because Stigerts's expert testimony was based, in part, on interviews of prostitutes and pimps. See United States v. Palacios, 677 F.3d 234, 243 (4th Cir. 2012) ("Although 'Crawford [v. Washington, 541 U.S. 36 (2004)] forbids the introduction of testimonial hearsay as evidence in itself,' we have recognized that 'it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to

-14-

otherwise inadmissible evidence.'" (quoting United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009))). In sum, we find no abuse of discretion in the district court's decision to admit Stigerts's testimony.

## C. Motion for Mistrial

As mentioned above, after the case was submitted to the jury, one of the jurors reported that he would not be able to continue serving as a juror, due to a medical issue. Outside the presence of the jury, the court asked whether the parties would agree to the case being decided by the remaining eleven jurors. Szczerba objected, and the court said that it would declare a mistrial, stating, "So in legal terms, this will be a mistrial; in real people terms, this will be a do-over. I will officially declare it with the other jurors out here." After the jury was called into the courtroom, the court explained that a juror was unavailable:

> Since that leaves 11 of you, there are two choices: One is to declare a mistrial, and the other is to go forward with 11. To go forward with 11 . . . , the parties have to agree. The parties have not agreed to go forward with 11, which I probably wouldn't agree with that either if I was sitting down there.

The law clerk then interrupted, informing the court that the twelfth juror had called and was able to report for duty. At a sidebar, Szczerba objected to the case being decided by the full jury and moved for a mistrial. The court overruled the objection, stating that it "hadn't declared [a mistrial] yet" and that "nothing has been said by the parties or me that impacts on their deliberations in a negative way."

The district court did not abuse its discretion in denying Szczerba's motion for a mistrial. See United States v. Wilson, 565 F.3d 1059, 1069 (8th Cir. 2009) (standard of review). We find no impropriety in the court's statements to the eleven

-15-

jurors, and we reject Szczerba's contention that the district court had declared a mistrial and thereafter improperly allowed the jury to continue deliberations.

## D. Motion for a New Trial

Szczerba argues that the district court abused its discretion in denying his motion for a new trial. See United States v. Spencer, 753 F.3d 746, 748 (8th Cir. 2014) (standard of review). He contends that the government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), by failing to disclose FBI Agent Lynch's interview summary until the fourth day of trial.

To establish a Brady violation, a defendant must show that: "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." Spencer, 753 F.3d at 748 (quoting United States v. Keltner, 147 F.3d 662, 673 (8th Cir. 1998)). "Evidence is not material simply because it would have 'help[ed] a defendant prepare for trial.'" Id. (alteration in original) (quoting United States v. Aleman, 548 F.3d 1158, 1164 (8th Cir. 2008)). It is instead "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. (quoting United States v. Ladoucer, 573 F.3d 628, 636 (8th Cir. 2009)). Giglio extended the government's duty to disclose to evidence that may be used to impeach government witnesses. United States v. Pendleton, 832 F.3d 934, 940 (8th Cir. 2016).

Szczerba learned about the evidence during trial. "Under the rule in our circuit Brady does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial." Spencer, 753 F.3d at 748 (quoting United States v. Almendares, 397 F.3d 653, 664 (8th Cir. 2005)). Accordingly, to establish a Brady violation, Szczerba must show

that the government's delay in disclosing the evidence deprived him of its usefulness and that this deprivation materially affected the outcome of his trial. Szczerba cannot meet this burden.

Szczerba was able to present and use the evidence during trial. As set forth above, when the government discovered that it inadvertently had failed to disclose the interview summary, it sent FBI agents to locate the man who was interviewed. It produced the summary to defense counsel, who alerted the court of the matter. When the court asked what relief the defendant sought, defense counsel stated that he "would like to inquire of Special Agent Lynch into the substance of the interview that she conducted," which the court allowed him to do. After FBI agents located the man, defense counsel met with him, but ultimately decided not to call him as a witness.

During cross-examination, Lynch explained the circumstances under which the man met B.M. and Edwards: that B.M. told the man that she used to be a stripper in New Orleans, Louisiana; that B.M. showed him photos of her posing for Penthouse; and that their conversation ended after the man declined to pay money for sex. During closing, defense counsel used the evidence to argue that Szczerba was not guilty because B.M. advertised herself as a prostitute.

> [B.M.] show[ed] people pictures of herself; not Keisha [Edwards], not Thomas [Szczerba]. She's doing exactly what the government wants you to believe Thomas [Szczerba] was doing in this case, and that's important.

Although Szczerba complains that he was unable to use the interview summary to impeach Nijkamp and B.M., he did not use the evidence to cross-examine Nijkamp when she was called in rebuttal, nor did he ask to recall B.M. as a witness. Accordingly, we conclude that the delay in the disclosure of the interview summary did not deprive Szczerba of its usefulness. Moreover, in light of the substantial

evidence against Szczerba, we also conclude that any deprivation did not materially affect the outcome of his trial.

## E. Challenges to Sentence

A presentence report (PSR) calculated Szczerba's sentencing range under the U.S. Sentencing Guidelines Manual (Guidelines or U.S.S.G.). It grouped together Szczerba's four counts of convictions, see U.S.S.G. § 3D1.2(b), and applied § 2G1.1 to address Szczerba's most serious count of conviction, interstate transportation of an individual to engage in prostitution, see U.S.S.G. § 3D1.3(a). The PSR applied § 2G1.1(c)'s cross reference to § 2A3.1 and determined that Szczerba's base offense level was 30. See U.S.S.G. § 2A3.1(a)(2). The PSR recommended increasing the offense level by 2 because B.M. sustained serious bodily injury. See U.S.S.G. § 2A3.1(b)(4)(B). With a total offense level of 32 and a criminal history category of I, Szczerba's advisory sentencing range was 121 to 151 months' imprisonment. Over Szczerba's objections, the district court adopted the calculations set forth in the PSR.

Szczerba argues that the district court erred in applying the cross reference, which resulted in a base offense level of 30. Guidelines § 2G1.1(c) instructs the district court to apply § 2A3.1 "[i]f the offense involved conduct described in . . . 18 U.S.C. § 2242." The statute provides:

> Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison . . . knowingly —
>
> (1)    causes another person to engage in a sexual act by threatening or placing that other person in fear . . .
>
> or attempts to do so, shall be fined under this title and imprisoned for any term of years or for life.

Szczerba contends that the cross reference does not apply because his offense conduct does not meet the jurisdictional element of 18 U.S.C. § 2242—*i.e.*, the offense did not occur within "the special maritime and territorial jurisdiction of the United States or in a Federal prison." We do not agree. The conduct described in § 2242 is "caus[ing] another person to engage in a sexual act by threatening or placing that other person in fear." See U.S.S.G. § 2G1.1 cmt. n.4(B) (explaining that "[f]or purposes of subsection (c)(1), conduct described in 18 U.S.C. § 2242 is: (i) engaging in, or causing another person to engage in, a sexual act with another person by threatening or placing the victim in fear").[4]

Szczerba argues that the district court erred in applying the cross reference and the 2-level increase to his offense level because the jury acquitted him of the counts that required a finding that Szczerba used force or threats of force. "[A] district court may use a defendant's relevant conduct in sentencing if it finds by a preponderance of the evidence that the conduct occurred, even if that conduct formed the basis of a criminal charge on which a jury acquitted the defendant." United States v. Tyndall, 521 F.3d 877, 883 (8th Cir. 2008). Pointing to the fact that the cross reference and enhancement caused his Guidelines sentencing range to increase from 15 to 21 months' imprisonment to 121 to 151 months' imprisonment, Szczerba argues that the district court should have been required to find by clear and convincing evidence that he had engaged in forceful or threatening behavior, an argument that is foreclosed by our precedent. See United States v. Villareal-Amarillas, 562 F.3d 892, 895 (8th Cir. 2009).

Szczerba argues that the district court committed procedural error when it failed to explain its reasons for imposing a 140-month sentence or address Szczerba's request for a downward variance. The court had extensive knowledge of this case

---

[4]We reject Szczerba's argument that the application note somehow conflicts with the Constitution, with 18 U.S.C. § 2242, and with U.S.S.G. § 2G1.1(c).

because it had presided over Szczerba's jury trial. It considered the parties' sentencing memoranda and related filings and listened to the parties' arguments during the sentencing hearing. We conclude that the court did not abuse its discretion in declining to respond to Szczerba's request for a downward variance and that it "was justified in relying on 'the Commission's own reasoning that a Guidelines sentence is a proper sentence.'" United States v. Dace, 660 F.3d 1011, 1014 (8th Cir. 2011) (quoting Rita v. United States, 551 U.S. 338, 356 (2007)).

Conclusion

Finally, we reject Szczerba's argument that the evidence at trial "was insufficient to permit a jury to reasonably conclude that any of the elements of the counts of conviction were proved beyond a reasonable doubt." Appellant's Br. 55. We conclude that, as set forth above, the evidence was sufficient to support the jury's findings that Szczerba committed conspiracy and crimes related to the prostitution of B.M. The district court thus did not abuse its discretion in denying his motion for judgment of acquittal.

The judgment is affirmed.

_____